**Merrill L. NASH and Don F. Gaston, Plaintiffs,**

v.

**DAYTON SUPERIOR CORPORATION, Defendant.**

No. 16429.

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 4, 1998.

Decided: Oct. 28, 1998.

Allen M. Terrell, Jr., Srinivas M. Raju, of Richards, Layton & Finger, Wilmington, Delaware; for Plaintiffs.

William D. Johnston, Matthew G. Zaleski, III, of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware; Of Counsel: David M. Rickert, of Thompson, Hine & Flory, LLP, Dayton, Ohio; for Defendant.

## OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

This action arises out of the 1997 acquisition of Symons Corporation, a Delaware corporation ("Symons"), by Dayton Superior Corporation, also a Delaware corporation ("Dayton Superior"). Plaintiff Nash was, at the time of the acquisition, the owner of 50% of the outstanding common stock of Symons. Plaintiff Gaston was the owner of 8.32% of Symons common stock and brings suit both on his own behalf and on behalf of all other Symons stockholders (other than Nash).[1] The Symons stockholders received, at closing, a fixed sum of money per share. The amount so received was subject to post-closing adjustments, to be based upon a balance sheet prepared as of the date of closing (the "Closing Balance Sheet"), and an assumed benchmark of net worth. Thus, if the Closing Balance Sheet showed a net worth less than the benchmark amount, the selling stockholders agreed to repay the difference to Dayton Superior. The obverse was also true.

The agreement of sale ("Agreement") contained a mechanism for the preparation of the Closing Balance Sheet and a process for resolving disputes about it. The steps involved (many of which have already been followed) may be summarized as follows:

*Step One:* Within 60 days of closing, Symons was required to cause the preparation and delivery of the Closing Balance Sheet to the selling stockholders. This balance sheet was to be prepared by Dayton Superior's independent auditors, who are required by the Agreement to prepare it in accordance with United States generally accepted accounting principles, consistently applied.

*Step Two:* The selling stockholders were given 45 days (extended by agreement to approximately 100 days) to deliver a written "Notice of Disagreement" to Dayton Superior "specify[ing] in reasonable detail the nature of any disagreement" with the Closing Balance Sheet.

*Step Three:* Following delivery of this notice, the selling stockholders and Dayton Superior were required to "seek in good faith to resolve in writing any differences which they may have with respect to matters specified in the Notice of Disagreement."

*Step Four:* In the event of a failure to reach complete agreement, the contract requires the parties to submit to an independent national accounting firm, selected by a specified mechanism, for "review and resolution" of "any and all matters which remain in dispute and which were properly included in the Notice of Disagreement." The accounting firm so selected is required to notify the parties of its determinations within 45 days of its appointment. Finally, the contract provides that "judgment may be entered upon the determination of the [a]ccounting [f]irm in any court having jurisdiction over the party against which such determination is to be enforced."

The Closing Balance Sheet was prepared and a Notice of Disagreement was delivered to Dayton Superior within the times allowed. The parties were not, however, able to reach complete agreement over the issues raised, thus requiring them to pursue the arbitration process specified in Step Four. Section

---

1. Evidently, Gaston is acting in representing these other stockholders pursuant to a power of attorney.

11.4(a) of the Agreement provides that it "shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of Delaware." Sections 11.4(b) and (c) provide for consent to service of process in Delaware (subsection (b)), and irrevocable and unconditional agreement and consent "that any suit, action or other legal proceeding arising out of or relating to this Agreement shall be brought and heard" in a Delaware Court (as defined therein) (subsection (c)).

## A. The Complaint

What is in dispute in this action is the scope of issues to be submitted to the accounting firm in Step Four. First, plaintiffs allege that Dayton Superior has attempted, improperly, to interject certain "New Items" during Step Three negotiations. While not identifying these "New Items" with any specificity, the complaint alleges that they "had not been raised or even indicated in either the Closing Balance Sheet or the Notice of Disagreement," and claims that Dayton Superior's "attempt to revise the Closing Balance Sheet with the New Items during Step Three is impermissible under the procedures established" by the Agreement. Second, the complaint asserts a claim relating to the establishment of a reserve on the Closing Balance Sheet for product liability claims. The Agreement provided, pertinently, that a Notice of Disagreement "shall ... include ... disagreements based on ... the determination of amounts involving discretion or judgment (including the amounts of reserves)." In the Notice of Disagreement, plaintiffs took the position that the indemnification provisions of the Agreement obviated the need to create any reserve for such potential liabilities. The complaint alleges that the question of whether any reserve is required (in distinction from the amount of a reserve) is a separate legal issue to be decided by the Court and is not subsumed in the arbitrable issue of the size of any such reserve The complaint is in two counts. Count I seeks injunctive relief and alleges (¶ 19) that unless the Court enjoins Dayton Superior from submitting to arbitration the New Issues and the loss contingency reserve issue, "the rights of the [p]laintiffs to limit the arbitration to only

those items properly submitted pursuant to the terms of the Agreement will be lost," and plaintiffs will suffer immediate and irreparable harm. Plaintiffs allege they have no adequate remedy at law. Count II (¶ 22) alleges that Dayton Superior has breached the Agreement by raising the New Issues and by taking the position that the loss contingency reserve is require under GAAP and that, as a result, an actual controversy exists between the parties "relating to their legal rights and their duties" under the Agreement. It prays for a declaratory judgment as follows: (i) that Dayton Superior is not permitted to submit the New Items to arbitration; (ii) that only those items specified in the Notice of Disagreement which have not been resolved are subject to arbitration; and (iii) that no loss contingency reserve should be established.

Subject matter jurisdiction is alleged to exist because the complaint seeks equitable relief under Court of Chancery Rule 65 and the Delaware Uniform Arbitration Act, 10 *Del. C.* § 5701 *et seq.* ("DUAA"), and because the matter "arises under the Delaware Declaratory Judgment Act, 10 *Del. C.* § 6501, *et seq.*" Of course, the Delaware Declaratory Judgment Act did not enlarge the jurisdiction of this Court, nor did it change the relationship between this Court and the Superior Court. *See Heathergreen Commons Condominium Ass'n v. Paul,* Del Ch., 503 A.2d 636, 642 (1985) (stating that "the Court of Chancery has jurisdiction over a declaratory judgment action only if there exists an underlying basis for equity jurisdiction measured by traditional standards."). Therefore, to hear this action, this Court's subject matter jurisdiction must be found either in the Court's inherent equity powers or in the statutory grant of power found in the DUAA.

## B. The Motion to Dismiss

Dayton Superior filed a motion to dismiss pursuant to Rules 12(b)(1), 12(b)(7) and 19(b), stating the following grounds:

1. Lack of subject matter jurisdiction because the arbitration provisions of the Agreement do not specify Delaware as the place for the arbitration to occur

and, as a result, the DUAA has no application;

2. Lack of subject matter jurisdiction because there does not exist a basis independent of the DUAA for the assertion of equity jurisdiction "in aid" of a foreign arbitration;

3. Lack of subject matter jurisdiction because the claims purportedly asserted pursuant to the Declaratory Judgment Act, 10 *Del. C.* §§ 6501–13, are not ripe for adjudication; and

4. Failure to join Symons, allegedly an indispensable party, as a party defendant. (Defendant has informed the Court that it will not be pursuing this ground for dismissal.)

In support of its motion, Dayton Superior submitted the Affidavit of John A. Ciccarelli, President and Chief Executive Officer of Dayton Superior ("Ciccarelli Aff."). Attached to this affidavit were the following documents: the Agreement (Exhibit A); the Closing Balance Sheet (Exhibit B); the Notice of Disagreement (Exhibit C); a letter dated April 27, 1998 from plaintiff Nash to Mr. Ciccarelli objecting to the New Items and the liability reserve (Exhibit D); and Dayton Superior's May 11, 1998 response (Exhibit E).

2. *General Elec. Co. v. Star Techs., Inc.*, Del. Ch., C.A. No. 14923, Chandler, V.C., 1996 WL 377028 (July 1, 1996), does not require a different result. In that case, the Court considered the question, "whether the Delaware Court of Chancery has subject matter jurisdiction under the [DUAA] to vacate" an arbitration award (i) made in the District of Columbia, (ii) pursuant to an agreement which failed to specify the place of arbitration, (iii) in the face of an action to enforce the award filed in the District of Columbia, (iv) where Delaware's only connection with the matter was the happenstance that the defendant was subject to the personal jurisdiction of Delaware courts. *Id.* at 7, 1996 WL 377028. The Court in *General Electric* held that as is "consistent with interpretations in other states ... for a court to obtain jurisdiction to confirm or vacate an award, the parties must either provide in their written agreement for arbitration in that state or, by common assent, actually arbitrate the matter in the state." *Id.* at 11, 1996 WL 377028.

The issue here is not whether this Court has jurisdiction to confirm or vacate an arbitration award already made. Rather, the question is whether this Court (or any court) has subject

## II.  DISCUSSION

### A.  Subject Matter Jurisdiction

#### 1.  Under the Delaware Uniform Arbitration Act

■ This action seeks to determine the proper scope of matters to be arbitrated pursuant to a contract to arbitrate which does not specify the place of arbitration (in this State, or elsewhere) but which does provide that it is governed by Delaware law and evinces the parties' intention to submit all disputes arising thereunder to a Delaware court for decision. In the circumstances, I find it unnecessary to determine whether the DUAA confers subject matter jurisdiction to hear the claim.[2] As recently decided in *SBC Interactive, Inc. v. Corporate Media Partners*, C.A. No. 16397, Steele, V.C., mem. op. at 10–12, 1998 WL 749446 (Oct. 7, 1998), this Court's inherent equity jurisdiction, inherited from the English Court of Chancery, includes the power to enforce arbitration agreements. *See also Eastman Kodak Co. v. Cetus Corp.*, C.A. No. 12249, Berger, V.C., mem. op. at 2–4, 1991 WL 202184 (Oct. 4, 1991).

#### 2.  Under Principles of Inherent Equity Jurisdiction

As these cases recognize, this Court's inherent powers include that of issuing injunc-

matter jurisdiction to enforce an agreement to arbitrate that does not specify the place of arbitration (but does specify the method) and where no place of arbitration has been established by common assent of the parties. In *General Electric*, the arbitration had taken place in Washington, D.C. and, under consistently applied law, D.C. courts had subject matter jurisdiction to vacate or enforce the award. Here, by contrast, because the Agreement does not specify a place for the arbitration and no arbitration has taken place, there is no other jurisdiction in which plaintiffs may more readily apply for the relief they seek. Indeed, it would appear from the terms of the Agreement that the parties expected, and intended, that litigation of this sort would be brought in this Court and not in some other jurisdiction. *General Electric* neither suggests nor requires the absurd result that the Delaware Court of Chancery is, by operation of a statute intended to encourage arbitration of disputes, deprived of subject matter jurisdiction to enforce an arbitration provision in a contract governed by Delaware law and specifying Delaware as the forum for resolution of all disputes arising thereunder.

tive relief to prevent irreparable harm. The complaint (¶ 19) alleges that "[o]nly through the exercise of this Court's equitable powers can [p]laintiffs be protected from the immediate and irreparable injury which [d]efendant's actions threaten. Unless injunctive relief is granted, [d]efendant will inequitable and illegally deprive [p]laintiffs' of their rights to have arbitrated only those disputes properly submitted pursuant to the terms of the Agreement." The complaint also alleges that plaintiffs do not have an adequate remedy at law because, as it may be inferred, it is not an adequate legal remedy to require arbitration of issues that are not arbitrable under the terms of the Agreement.

These allegations clearly seek to invoke this Court's general equitable jurisdiction. Nevertheless, the inquiry does not stop at the identification of the appropriate form of words in the complaint. A more practical analysis of the matters alleged in the complaint is required by the limited nature of this Court's jurisdiction. As former Chancellor Allen said in *McMahon v. New Castle Associates:*

> Chancery jurisdiction is not conferred by the incantation of magic words. Neither the artful use nor the wholesale invocation of familiar chancery terms in a complaint will itself excuse the court, upon a proper motion, from a realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate. If a realistic evaluation leads to the conclusion that an adequate legal remedy is available this court, in conformity with the command of section 342 of title 10 of the Delaware Code will not accept jurisdiction over the matter.

Del. Ch., 532 A.2d 601, 603 (1987) (citations omitted.)

Dayton Superior argues that arbitration is an adequate legal remedy and, thus, no basis for equitable jurisdiction exists. This is not because the issue of arbitrability should itself be decided by the arbitrator. On the contrary, Dayton Superior recognizes that because the arbitration provisions of the Agreement are limited in scope, arbitrability is for the Court to decide. Rather, Dayton Superi-

or asserts that, under the standard of analysis recently articulated by the Delaware Supreme Court in *SBC Interactive*, the issues about which plaintiffs seek to litigate are plainly arbitrable.

In *SBC Interactive*, the Supreme Court said the following:

> In a proceeding to stay or to compel arbitration, the question of whether the parties agreed to arbitrate, commonly referred to as "substantive arbitrability," is generally one for the courts and not for the arbitrators. In determining arbitrability, the courts are confined to ascertaining whether the dispute is one that, on its face, falls within the arbitration clause of the contract. Courts may not consider any aspect of the merits of the claim sought to be arbitrated, no matter how frivolous they appear. Any doubt as to arbitrability is to be resolved in favor of arbitration. A court will not compel a party to arbitrate, however, absent a clear expression of such an intent.

*SBC Interactive*, Del.Supr., No. 43, 1998, Walsh, J., mem. op. at 9–10, 1998 WL 749446 (Aug. 10, 1998) (citations omitted).

█ Thus, in considering a challenge to the Court's subject matter jurisdiction in a dispute involving substantive arbitrability, the proper analysis would appear to involve two related inquiries: the threshold question of whether the dispute is one which, on the face of the arbitration clause of the contract, is subject to arbitration; and the ultimate question of whether, realistically evaluating the complaint, a legal remedy is available and fully adequate. I address each of plaintiffs' claims separately.

█ The first claim addresses Dayton Superior's "attempt to revise the Closing Balance Sheet with the New Items." Bearing in mind that I "may not consider any aspect of the merits of the claim ... no matter how frivolous they may appear," I find that this claim does not, "on its face, fall[ ] within the arbitration clause of the contract." *See id.* at 9, 1998 WL 749446. There is, at least potentially, a factual question as to whether the parties intended the arbitration process to permit Dayton Superi-

or to revise the Closing Balance Sheet in response to objections raised by the Notice of Disagreement. For this reason, and in the present posture of the matter, I am unable to conclude that the New Items claim is clearly arbitrable.

Given this finding, "a realistic evaluation" leads to the conclusion that an adequate legal remedy is not available. *See McMahon,* Del. Ch., 532 A.2d at 603. If the parties did not intend either (1) to allow Dayton Superior to revise the Closing Balance Sheet in response to the Notice of Disagreement or (2) to have such response, even if allowed, be part of the arbitration provision, then arbitration over the New Items is not an adequate legal remedy. *See SBC Interactive,* Del.Supr., No. 43, 1998, at 10, 1998 WL 749446 ("A court will not compel a party to arbitrate . . . absent a clear expression of such an intent."). For this reason, Dayton Superior's motion to dismiss for lack of subject matter jurisdiction must be denied as to plaintiffs' claim regarding the New Items.

█ Plaintiffs second claim is that the "establishment" of the product liability reserve on the Closing Balance Sheet is a legal question distinguishable from the concededly arbitrable question of the appropriate size of such a reserve. Unlike plaintiffs' first claim, I find that this claim does "on its face, fall[ ] within the arbitration clause of the contract." *See SBC Interactive,* Del.Supr., No. 43, 1998, at 9, 1998 WL 749446. The Agreement sets forth the items properly includable in the Notice of Disagreement and which are to be subsequently submitted to arbitration should negotiations for resolution fail. It states that the Notice of Disagreement "shall . . . include . . . disagreements based on . . . the determination of amounts involving discretion or judgment (including the amounts of reserves)." Plainly, the establishment and determination of the amount of a balance sheet reserve in accordance with Financial Accounting Standards Bulletin No. 5 involve

matters of "discretion or judgment" within the meaning of the arbitration agreement. If there is now a dispute as to whether a product liability reserve is appropriate, I find both its "establishment" and "amount" to be arbitrable issues on the face of the arbitration agreement.

Having made the determination that the question of the product liability reserve is one that is clearly arbitrable, the application of the *McMahon* standard is simple, as the remedy of arbitration is one clearly adequate as a matter of law. For this reason, Dayton Superior's motion to dismiss for lack of subject matter jurisdiction must be granted as to plaintiffs' claim regarding this specific reserve.

## III. CONCLUSION

In conclusion, the motion to dismiss will be granted in part and denied in part. The allegations in the complaint relating to the establishment of the product liability reserve on the Closing Balance Sheet are dismissed, together with all claims relating thereto in both Count I and Count II. The allegations relating to the New Items will be the subject of further proceedings. The parties are to confer and submit an agreed upon form of order.

The parties should also confer upon a schedule leading to the prompt disposition of this case on the merits. If possible, the matter will be tried in December, 1998. The parties should submit an appropriate order, after consultation with the Court, scheduling all necessary pretrial matters.